**In re MOBILE TELECOMMUNICATION TECHNOLOGIES CORP. SECURITIES LITIGATION.**

Master No. 3:94–CV–6.

United States District Court,
S.D. Mississippi,
Jackson Division.

Nov. 6, 1995.

James R. Mozingo, Edmonson, Biggs, Mozingo & Holbrook, Jackson, MS, David J. Bershad, Lee S. Shalov, Regina L. LaPolla, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Leonard Barrack, Sheldon L. Albert, Samuel R. Simon, Barrack, Rodos & Bacine, Philadelphia, PA, for plaintiff Levin and consolidated plaintiffs Conn, Jackson, Cheles, Agris, Beladino. Trustee for Winslow's Pharmacy, Inc. Profit Sharing Plan.

Richard M. Edmonson, James R. Mozingo, Edmonson, Biggs, Mozingo & Holbrook, Jackson, MS, for plaintiffs Silverstein and Tolchin.

Alan Walter Perry, Forman, Perry, Watkins & Krutz, Jackson, MS, Thomas F. Cullen, Jr., James D. Wareham, Mary L. Hale, Jones, Day, Reavis & Pogue, Washington, DC, Michael J. McConnell, Jones, Day, Reavis & Pogue, Atlanta, GA, for defendants Mobile Telecommunication Technologies Corp., Palmer, Fugate, Garrison, A.I. P. Bhagat.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Defendant Mobile Telecommunication Technologies Corp. (Mtel), through its subsidiary operating companies, provides nationwide paging services and engages in other communications-related business, including telephone answering services and air-to-ground and marine telecommunications. In addition, Mtel maintains and develops international paging operations, and has developed and recently launched a two-way Nationwide Wireless Network (NWN) to enable users to send and receive messages, acknowledge message receipt and execute certain wireless transactions. Mtel's primary business, its nationwide paging service, is operated by its main subsidiary, SkyTel Corpo-

ration, which accounts for most of Mtel's revenues. As detailed in the consolidated amended complaint filed in this case, throughout 1993, Mtel made a series of highly optimistic statements about the company's operations, as well as predictions about its future performance. The market responded, with Mtel's stock rising from $18.25 on March 31, 1993, to a high of $38.25 on October 14, 1993. On January 5, 1994, Mtel announced a long-term "strategic plan" which included a substantial reduction (from $69.95 to $39.95) in the retail price of its monthly service charge for SkyTel's nationwide paging service. The company simultaneously reported that it expected to incur start-up losses in certain international markets, particularly its wholly-owned businesses in Columbia and Argentina, and it announced that start-up losses from its NWN would begin in the second half of 1995. Although it predicted that SkyTel would remain profitable, Mtel projected that it would incur consolidated losses from operations in 1994 and 1995 as a result of reduced SkyTel profits and the expected start-up losses from the international ventures.

Following Mtel's announcement, the price of Mtel stock dropped dramatically, from $26 to $16.50, in extremely heavy trading. It is that decline which precipitated the present lawsuit. In the days following Mtel's announcement, five Mtel shareholders filed separate securities fraud complaints against Mtel, its chairman and chief executive officer, John N. Palmer, its chief financial officer, J. Robert Fugate, and its executive vice president, Jai P. Bhagat. These various plaintiffs thereafter filed a consolidated class action complaint, seeking to represent a class consisting of all persons and entities who purchased Mtel common stock during the period March 31, 1993 through January 5, 1994, inclusive, and alleging that during the class period, Mtel made material misstatements and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 (Act), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The complaint also alleged claims against the individual defendants Fugate, Palmer and Bhagat, as "controlling persons," under § 20(a) of the Act, 15 U.S.C.

§ 78t(a), and raised state common law fraud and negligent misrepresentation claims.

Defendants have now moved to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can be granted and under Rule 9(b) for failure to plead fraud with particularity. Plaintiffs oppose dismissal and insist that they have adequately pled each of their claims. The court, having reviewed the parties' memoranda of authorities, and having thoroughly considered their arguments in support of their respective positions, concludes that defendants' motion to dismiss should be granted.

As indicated, plaintiffs allege that both before and during the class period, defendants made numerous false and misleading statements about Mtel's products, its business and its prospects (the specifics of which will be addressed hereinafter), all of which caused the market price for Mtel stock to become artificially inflated. In evaluating a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to plaintiff, accepting as true all material factual allegations, as well as all reasonable inferences to be drawn therefrom (though the court will not accept conclusory allegations). *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994); *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050) (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). The court may then dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Usually a plaintiff's complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed.R.Civ.Proc. 8(a)(2). In other words, he "must simply allege all of the elements of a right to recover against a defendant." *Tuchman,* 14 F.3d at 1067. However, claims of securities fraud, like other fraud claims, are subject to the heightened level of pleading established by Rule 9(b) of the Federal Rules of Civil Procedure, which requires that

"the circumstances constituting fraud or mistake shall be stated with particularity." *See id.*

In *Tuchman,* the Fifth Circuit recognized the important screening function which this more stringent pleading requirement serves in securities fraud suits, in particular, stating:

the heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.

*Tuchman,* 14 F.3d at 1067; *see also Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir.1994); *Central Bank, N.A. v. First Interstate Bank,* —— U.S. ——, ——, 114 S.Ct. 1439, 1454, 128 L.Ed.2d 119 (1994) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 739, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975)) ("Litigation under rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general."). Thus, a securities fraud complaint is subject to dismissal unless it sets forth "certain minimum allegations, . . . namely the specific time, place, and contents of the false representations, along with the identity of the person making the representations and what the person obtained thereby." *Melder,* 27 F.3d at 1100 (citing *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993)).

■ Section 10(b) and Rule 10b–5 "offer protection against a certain kind of statement: one that is misleading because it either fails to state a material fact or states a material fact falsely." *Isquith v. Middle South Utilities,* 847 F.2d 186, 203 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). To state a claim under § 10(b) and Rule 10–5, plaintiffs must allege specific facts to establish "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury." *Shushany v. Allwaste, Inc.,* 992 F.2d 517,

520–21 (5th Cir.1993) (quoting *Cyrak v. Lemon,* 919 F.2d 320, 325 (5th Cir.1990)).

In their consolidated amended complaint, under the heading "Substantive Allegations," plaintiffs list a number of statements uttered by and about Mtel throughout 1993; then, as support for each of their various claims, they conclude that *all* of the public statements by defendants referenced in the complaint were materially false, misleading, or lacked a reasonable basis when made. And they allege that defendants wrongfully withheld or concealed material information. More particularly, plaintiffs purport to predicate liability on defendants' alleged "misrepresentation and non-disclosure of material facts regarding competition in the marketplace and the effects of increasing competition on Mtel's business, prices and future operating results;" defendants' "dissemination into the marketplace of positive statements and projections regarding Mtel's future prospects that lacked any reasonable basis because of undisclosed adverse business and competitive conditions (known to or recklessly disregarded by defendants at the time the challenged representations were made) that prevented Mtel from achieving the results forecasted by defendants at all relevant times"; and defendants' "failure to publicly disclose Mtel's active consideration and exploration of a strategic business plan, pursuant to which SkyTel would and ultimately did sharply reduce the prices of its various products." Plaintiffs maintain that these misstatements and omissions by defendants were intended to and did have the effect of creating in the market an unrealistically positive assessment of Mtel and its profitability, thus causing the company's common shares to be overvalued and artificially inflated, and resulting in loss to those who purchased Mtel stock during the class period. Plaintiffs' complaint is due to be dismissed for the reasons that follow.[1]

■ A number of the statements which plaintiffs cite in their complaint are statements of true historical facts. To the extent that plaintiffs may be attempting to base a charge of securities fraud on such state-

---

1. In ruling on the present motion, the court has considered only the pleadings, as well as documents incorporated in the complaint, and thus treats this as a motion to dismiss and not as a motion for summary judgment. *See Rubinstein v. Collins,* 20 F.3d 160, 162 n. 5 (5th Cir.1994).

ments, they have not stated a viable claim for relief for such statements as these are not actionable as a matter of law. This applies to March 1993 statements characterizing SkyTel as a "pioneer" in wireless communications with "unmatched" capabilities in wireless messaging technologies. In fact, SkyTel did "pioneer the nationwide paging and voice messaging business in the United States," and in 1992 it did offer new and innovative "service and product offerings to further enhance its nationwide paging and voice messaging service in the United States." Moreover, defendant Palmer's March 1993 characterization of Mtel as a "well-capitalized company with an impressive track record of growth and a leadership position in the industry" was accurate when made and not the least bit misleading.[2]

True, too, was Mtel's May 1993 announcement that it had successfully completed tests of its NWN, which it touted as "a significant milestone in the development of the network." And the Company's June 1993 report that the FCC had awarded it the first final Pioneer's Preference for a two-way personal communications system, as well as its subsequent October 1993 report that competing applicants for pioneer preferences had been unsuccessful in their challenge to the FCC's award to Mtel, were likewise true. There was nothing false in Mtel's further declaration in connection with these reports that it intended to file a formal license application in October 1993 for authority to construct the NWN system, which it expected would be operational by mid–1995. Nor was there anything false or misleading about defendant Fugate's report in July 1993 that SkyTel had constructed a second frequency that "would significantly increase SkyTel's system capacity, thereby enabling SkyTel to achieve future growth." Finally, plaintiffs' reference to Mtel's October 12, 1993 announcement that it had completed a private stock placement, which produced net proceeds of $181 million, does not provide a basis for a securities fraud claim, as there is no allegation that this did not occur precisely as reported by Mtel.

■ Another category of statements identified in the complaint is opinions and predictions expressed by persons or entities *other than the defendants*. Such statements are not properly the subject of a claim for securities fraud against defendants. For example, plaintiffs allege that on June 25, 1993, the New York Times reported that analysts were projecting profits of as high as $.25 a share for Mtel in 1993, presumably based, at least in part, on a Morgan Keegan report, issued June 28, 1993, forecasting that Mtel would earn $.25 a share in 1993 and $.65 a share in 1994. The Morgan Keegan report recited:

the potential for above-average growth over the next five years indicates that the stock should continue to do well and [an analyst] rates it a Buy (1) for both near and long term. The company has turned positive in both cash flow and earnings and proved that a profitable market exists for nationwide paging.

Thereafter, a July 30, 1993 report from Alex Brown & Sons, Inc. upgraded Mtel's stock from "neutral" to "buy," and raised its 1993 earnings per share estimate from $.18 to $.27, stating that the 1994 earnings per share was "likely to be around $.55." At the same time, Alex Brown reported that PageNet—the country's largest provider of regional paging services—planned to enter the nationwide paging market. But the analyst opined

2. Many of these types of statements appeared in Mtel's 1992 Annual Report, issued in March 1993, where the following statements appear:

Mtel is a pioneer in wireless communications, with a focus on providing nationwide and international messaging services to business travelers.

Through its SkyTel Corp. subsidiary, Mtel is the leading provider of nationwide messaging services in the United States.

. . . . .

Our success has earned us the respect of our customers and the financial community, and Mtel today is a well-capitalized company with an impressive record of growth and a leadership position in the industry. . . .

In July, the FCC awarded Mtel a tentative "Pioneer's Preference" to develop a two-way nationwide wireless messaging network, the first and only such award for a personal communications system (PCS). Based on this tentative Pioneer's Preference, Mtel is developing a new two-way network called Nationwide Wireless Network (NWN).

We estimate that NWN will become operational in 1995.

that "the potential market appears large enough to accommodate several service providers."

Plaintiffs have pled no specific facts connecting defendants to any of these statements and predictions; therefore, at least for that reason, these statements cannot provide the basis for a federal securities law claim. *See Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (defendant not liable for statements in analysts' report because allegations were insufficient to show that defendant "exercised the kind of control over the Goldman Sachs report that would render it liable for statements made therein"); *Genna v. Potts*, No. HAR 94–3260, 1995 WL 222043 (D.Md. Apr. 13, 1995) (quoting *Raab*).[3]

■ Plaintiffs point to other statements which, in the court's opinion, are far too vague to be material. Such statements include Mtel's January 1993 statement that it "remain[ed] highly encouraged by the market demand for wireless messaging in the U.S.," and Palmer's declaration in the 1992 Annual Report that Mtel's strategy at that time was "to continue to be a leader in the development of wireless messaging services on an international basis." *See Raab*, 4 F.3d at 289 (" 'Soft,' 'puffing' statements ... generally lack materiality because the market price of the share is not inflated by vague statements predicting growth.... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.").

■ That principle also dooms plaintiffs' allegations of liability respecting Mtel's January 1993 declaration that it "expect[ed] the record of growth achieved at SkyTel in 1992 to continue at similar levels in 1993," and Fugate's February 1993 statement, reported by Reuters, that "[w]e are highly optimistic

that we will be profitable in 1993 as demand for nationwide and international wireless messaging services continues to grow both in the U.S. and in the international countries we serve." These statements of optimism are too vague and general to provide the foundation for a securities fraud claim.

■ Moreover, as plaintiffs acknowledge, these and other optimistic predictions for Mtel's 1993 performance proved true. Plaintiffs allege, for example, that on January 20, 1993, a Dow Jones News Wire report described Fugate as " 'comfortable' with projections that SkyTel's revenues would increase in 1993 to approximately $100 million." [4] Then on April 22, 1993, Fugate, in connection with his announcement of Mtel's first-quarter results, declared that Mtel "expects to be profitable throughout 1993." On July 28, 1993, Mtel announced its 1993 second-quarter earnings, with Fugate stating that the construction of a second frequency by SkyTel "would significantly increase SkyTel's system capacity, thereby enabling SkyTel to achieve future growth ...," and forecasting that "earnings from operations in the fourth quarter are expected to increase from the third quarter level as SkyTel's revenues begin to grow." Plaintiffs do not contend that any of these statements proved false. Nevertheless, plaintiffs maintain that there was no reasonable basis for the statements when made. Contrary to defendants' position, standing alone, the fact that predictions turn out to be true does not necessarily always dictate dismissal of a plaintiff's fraud claim based on those statements. *Cf. Renz v. Schreiber*, 832 F.Supp. 766, 778 (D.N.J.1993) ("[B]ecause the defendants gave accurate predictions about the costs of starting up and expanding the FCB business, short term financial results, and FCB sales, when measured against actual experience, there are no facts upon which plaintiffs can show that

---

**3.** The manner in which plaintiffs have arranged their complaint makes it difficult to know plaintiffs' purpose in citing these statements. It may be that plaintiffs' sole purpose in including these particular analysts' statements was to demonstrate the market's response to the positive news that Mtel was disseminating. In an abundance of caution, however, and in an effort to be comprehensive, the court will assume that plaintiffs

are contending that these statements were fraudulent and attributable to defendants.

**4.** Any claim based on this statement is subject to dismissal for the further reason that plaintiffs have failed to demonstrate that it is properly attributable to defendants. *See Raab*, 4 F.3d at 289.

defendants' statements or omissions on these topics amounted to false or misleading information."). Of course, under Section 10(b) and Rule 10b–5, statements of *existing* fact are actionable only if false, but when predictions are involved, "the focus of the inquiry into falsity is different … than it is in the case of statements of fact." *In re Healthcare Compare Corp. Sec. Litig.*, No. 93 C 1970, 1994 WL 262730, at *4 (N.D.Ill. June 2, 1994). The focus is not on whether the statement was true or false, but whether there was a reasonable basis for the statement. Plaintiffs offer no factual explanation for their conclusory assertion in the case at bar that defendants lacked a reasonable basis for their *1993* predictions. What they do suggest is that it was merely "fortuitous" that the statements proved accurate. *See* 5B Jacobs, A., *Litigation and Practice Under Rule 10b–5* § 61.01[b] ("[A] defendant cannot successfully defend on the ground that a subsequent fortuitous event rendered a misleading statement true, if plaintiff was committed to act prior to such event."). Yet they do not identify any "fortuitous" happening which they claim caused the statements to become true. In sum, plaintiffs have provided no factual basis for concluding that Mtel's attainment of the results predicted for 1993 was fortuitous, or that the statements were made without a reasonable basis.

In addition to defendants' predictions regarding Mtel's 1993 performance, statements were made relating to Mtel's position in the market, and predictions were made concerning Mtel's anticipated performance for 1994 and beyond. For example, on March 31, 1993, Mtel filed its Form 10–K in which it bullishly portrayed Mtel's business, existing products and new ventures, creating, according to plaintiffs' characterization, "the clear impression that Mtel was well-positioned for future growth and prosperity." Mtel contemporaneously issued its 1992 Annual Report to stockholders, wherein Palmer, after highlighting "industry developments in 1992 [that] offer new opportunities to expand [Mtel's] customer base," remarked:

> Experts now acknowledge Mtel's pioneering role and head-start on the competition in our industry. As one market analyst said recently, "Over the next three or four years, we'll see a rapid building of the franchise value of Mtel as a clear leader in the first truly effective wave of wireless communications."

We agree with this assessment and believe that Mtel is well-positioned to benefit from a revolution in wireless technology.

Later, on April 22, 1993, Reuters reported Fugate as publicly projecting Mtel's capital expenditures would reach $35 million in 1993, but then decline in 1994 to $20 million. Then, in a June 14, 1993 Barron's article, Fugate was reported as stating that "Mtel expects to remain profitable for all of this year and to show even better results in 1994." Fugate, the article reported, stated that Mtel's "market isn't plagued by price-cutting." The writer concluded, "Fugate seems at ease with Street estimates that put Mtel net [earnings] at 20–25 cents a share in 1993 and 50–75 cents next year."

■ Regarding the actionability of predictions under the securities laws, the Fifth Circuit has recognized that Rule 10b–5 does not "exempt[ ] predictions, as a category, from its reach." *Isquith*, 847 F.2d at 203. Rather, "predictions may be regarded as 'facts' within the meaning of the anti-fraud provisions of the securities laws." *Id.* The utterance of predictive statements will give rise to liability, however, only if the "statement was 'false' when it was made." *Id.; see also Shushany*, 992 F.2d at 524 ("Statements that are predictive in nature are actionable only if they were false when made."). The determination of whether a predictive, or forward-looking statement, was "false" when made turns on whether the statement, when made, was made "without a reasonable basis" or was "disclosed other than in good faith," *Isquith*, 847 F.2d at 204 n. 12, since

> the only truly factual elements involved in a projection are the implicit representations that the statements are made in good faith and with a reasonable basis.

*Id.* (quoting B. Hiler, *The SEC and the Courts' Approach to Disclosure of Earnings Projections, Asset Appraisals, and Other Soft Information: Old Problems, Changing Views*, 46 Md.L.Rev. 1114, 1123 (1987)). Discussing the actionability of predictive state-

ments, the Fifth Circuit observed in *Rubinstein v. Collins,* 20 F.3d 160 (5th Cir.1994), that "predictive statements are deemed to contain false statements of 'fact' under Rule 10b–5 when the predictions embodied in those statements do not have a reasonable basis." *Id.* at 168. The court went on to say:

> "Most often, whether liability is imposed depends on whether the predictive statement was 'false' when made. The answer to this inquiry, however, does not turn on whether the prediction in fact proved to be wrong; instead, falsity is determined by examining the nature of the prediction—with emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis. In sum, a predictive statement is one that contains at least three factual assertions that may be actionable: 1) The speaker genuinely believes the statement is accurate; 2) there is a reasonable basis for that belief; and 3) the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement.

*Rubinstein,* 20 F.3d at 166 (quoting *Isquith,* 847 F.2d at 203–04).

▮ Plaintiffs allege that defendants had no reasonable basis for their optimistic statements and predictions since defendants "affirmatively knew (or, at a minimum, recklessly disregarded) adverse material information regarding, *inter alia,* Mtel's operations, competitive position and future business prospects." Regarding competition specifically, plaintiffs charge that "defendants knew ... that ... increasing competition was eroding Mtel's profits and operating margins and would cause the Company to radically alter its pricing structure;" and they charge that "[d]efendants' public statements were false, misleading and lacking in reasonable basis" in that defendants misrepresented and/or failed to disclose, *inter alia,* that:

> Contrary to defendants' public assurances that competitive forces would not adversely affect the Company's operations and financial results Mtel was experiencing and would continue to experience severe pric-

ing pressure from competitors in the industry[.]

But the complaint alleges no *facts* from which one could reasonably infer that Mtel misrepresented its competitive position, either by affirmative statements or by omission of material information. That is, there is no factual allegation anywhere in the complaint that Mtel had *any* competitors, or had reason to anticipate any substantial competition at the time the challenged statements were made.

To recap, on the subject of competition, Palmer declared in the 1992 Annual Report that Mtel had a "headstart on the competition in our industry," and characterized "Mtel as a clear leader in the first truly effective wave of wireless communications." Later, Fugate, as reported by the June 1993 *Barron's* article, stated that Mtel's "market isn't plagued by price-cutting." Manifestly, the competitive threat to which plaintiffs allude is that posed by PageNet, for they do not identify any other competition which they contend undermined Mtel's competitive position. However, as plaintiffs' complaint makes clear, at the time these challenged statements were made, there had been no announcement—formal or otherwise—that PageNet planned to enter the nationwide paging market. The first such announcement, *according to plaintiffs' own allegations,* occurred on July 30, and even then, there was no public disclosure of PageNet's specific intentions. Information concerning the extent of PageNet's planned competitive effort did not come until months later, on October 28, 1993, when PageNet announced that it intended to offer nationwide service for $39.95, nearly half the $69.95 charged by SkyTel, and that it intended to convert Mtel customers. In light of these facts—facts which plaintiffs have themselves alleged—there is no *factual* basis for their conclusion that Mtel, at the time the above-referenced statements regarding Mtel's competitive position were made, was faced with "pricing pressure" or that "increasing competition was eroding Mtel's profits and operating margins."

Moreover, one cannot garner from the complaint any fact-based allegation to sub-

stantiate plaintiffs' conclusory assertion that Mtel "downplayed" or "concealed" the potential effect of competition following PageNet's October 28, 1993 announcement. The only statement by the company on the subject of the PageNet announcement appeared in an October 28 article in The Dallas Morning News which anticipated that PageNet would announce "that it will launch a service that will drive down the costs of getting paged nationwide ...," and recited that PageNet was "expected to announce that it had completed construction of a nationwide paging network...." The writer continued:

> The all-digital network could refashion the paging business, putting PageNet in direct competition with Skytel Corp.— which pioneered the idea of national and international paging service—and open the door for wide broadcasting of electronic messages to such new devices as palmtop computers, handheld communicators and personal organizers.

> "There's ample room for growth and competition here," said David W. Garrison, president of Skytel, the Jackson, Miss. company that has dominated the field of nationwide paging with about 300,000 business customers. He estimates that Skytel and its current competitors, such as Bell-South Corp. and Pacific Telesis Group, have only tapped about 5 percent of a likely market of 5.6 million frequent travelers.

> If nothing else, SkyTel could get squeezed. PageNet, which has driven costs down to about $10 a month for local paging service, is likely to announce a nationwide paging service that costs $30 a month, about half SkyTel's basic rate.

5. The mere fact that some two months later, Mtel announced a plan to cut prices does not provide the necessary factual basis for such an inference, since the question whether there was a reasonable basis for the statement is determined by reference to the point in time when the statement was made, and not by reference to subsequent events. It should be noted, as well, that Garrison did not purport to address Mtel's profit margins, nor did he in any way intimate that Mtel would not have to alter its pricing strategy in order to compete against PageNet in the event PageNet in fact offered its services at lower rates.

It is apparent from the tenor of the article that when the statements were made by Garrison, PageNet had not yet announced its specific intentions regarding pricing or its intention to convert Mtel's customers. In any event, the complaint alleges no facts that might tend to show that Garrison either did not believe his statement, that he lacked a reasonable basis for his professed belief that the market would readily accommodate both companies, or that he possessed information that undermined the accuracy of his statement.[5]

Moreover, other than plaintiffs' conclusory characterization, nothing in the complaint would support a finding that defendants made public *assurances* that Mtel's operations and financial results would not be adversely affected by competitive forces. To the contrary, the fact that competition—especially from a company like PageNet—could adversely affect Mtel's prospects was disclosed by defendants. In its Form 10–K filed by Mtel on March 31, the following warning appeared under the heading "Competition":

> Continuing technological advances in the communications industry make it impossible to predict the future competition in the businesses in which Mtel operates. Such technological advances may, for example, make available other alternatives to the services provided by SkyTel, thereby creating additional sources of competition. *In addition, future entrants into the market which possess significantly greater financial resources than Mtel could have a significant, adverse competitive impact upon SkyTel's operations.* (Emphasis added).

A further such proviso appeared in a June 25, 1993 article in The New York Times, cited by plaintiffs,[6] which reported:

6. Though plaintiffs' complaint recites only a portion of this article, the court may consider the remainder of the document in ruling on the present motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim,

[F]uture profits from the new wireless data services that Mtel intends to provide are much more uncertain. Digital technology is advancing so rapidly that powerful new rivals are already muscling in with a slew of new alternatives.

Two companies already provide two-way nationwide data networks that are primarily designed for people using laptop computers. One is RAM Mobile Data, a company owned in party by BellSouth. The second is Ardis, a joint venture between I.B.M. and Motorola.

But far more formidable competition is on the horizon. The cellular industry has developed a technology called "cellular digital packet data," which will soon allow customers to use portable computers to send or receive data on the same frequencies used for telephone conversations.....

The prospect of all this competition undermines one of Mtel's main investment enticements—its secure spot on the nation's crowded airways....

But in Mtel's case, some analysts believe this inherent value has been exaggerated. "The two-way data market is going to be very competitive," said Mark Roberts, a communications analyst at Alex Brown & Sons in Baltimore, who has given the stock a neutral rating. "A lot of investors are assuming very high franchise values," he said. "They're assuming just because you have a network in place, it has intrinsic value. We believe a lot of those expectations are too high."

Jai P. Bhagat, president of Mtel, said he hopes to launch his new network by July 1995, and he freely acknowledged that the competition would be intense. But he said his network would stand out from the crowd because of its nationwide reach and its special niche services....

"This is going to be a huge market," he remarked. "There will be room for lots of companies. The key will be developing applications."

Plaintiffs fault defendants for not disclosing, after PageNet's announcement of its entry into the nationwide paging arena, that PageNet was a competitive force to be reckoned with. In other words, Mtel's silence is suggested to have led the market to believe that Mtel would be unaffected by this development. Silence can give rise to liability under the federal securities laws, but only where there is a duty to disclose. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). "Rule 10b–5 imposes ... a duty to disclose only when silence would make other statements misleading or false." *Taylor v. First Union Corp.,* 857 F.2d 240, 244 (4th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989). In the case at bar, plaintiffs' allegations are deficient since they have identified no statement that was actually rendered misleading by the defendants' alleged failure to specifically acknowledge, following PageNet's entry into the market, that it was confronted with serious competition and would have to take steps to effectively compete.

Additionally, where, as here, the information allegedly withheld is available to the market from other sources, there is no duty to speak. *See Ward v. Succession of Freeman,* 854 F.2d 780 (5th Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989). Here, the market was fully aware of PageNet's entry into the nationwide paging services market by offering products and services at prices significantly lower than SkyTel's. Upon PageNet's announcement of its intent to enter the market, Mtel had no duty to disclose the obvious fact that competition would increase.[7]

In summary, the court is of the opinion that plaintiffs have failed to identify any facts to support their conclusory assertion that defendants at any time misrepresented Mtel's competitive position or concealed any

because plaintiff should not so easily be allowed to escape the consequences of its own failure.").

**7.** That is, defendants were not required to disclose the obvious: that if two companies offer comparable products in the same market, one at half the cost of the other and seeking to convert the other's customers, then there exists a competitive threat.

material facts regarding Mtel's competitive position.

■ Plaintiffs also complain that defendants failed to disclose that they were "actively considering and exploring a long-term strategic business plan for the Company and SkyTel that would substantially reduce the Company's operating profits, revenues and margins." Defendants do not dispute—nor could they reasonably do so—that Mtel's plan to cut prices, once formed, was material and thus was required to be made publicly known. And it *was* made publicly known. The relevant inquiry, though, is *when* was it required to be made known. A company's tentative or preliminary consideration of a course of action is generally not considered material. *See Taylor,* 857 F.2d at 244–45.

> [T]he more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance to that decision. To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to "bury the share-holders in an avalanche of trivial information"; the very perils that the limit on disclosure imposed by the materiality requirement services to avoid.

*Id.; see also Panfil v. ACC Corp.,* 768 F.Supp. 54, 57 (W.D.N.Y.), *aff'd without opinion,* 952 F.2d 394 (2d Cir.1991); *Gay v. Axline,* No. 93–1491, 1994 WL 159426, at *5 (1st Cir. Apr. 26, 1994) ("the fact that discussion has begun about a project with a potentially substantial impact on a company's stock price ordinarily would not be material if the likelihood of its happening were extremely remote"); *In re Goodyear Tire &*

*Rubber Co. Sec. Litig.,* Civ.A. No. 88–8633, 1993 WL 130381, at *5–6 (E.D.Pa. Apr. 22, 1992) (no duty to disclose information that was not reasonably certain). Materiality, then, is judged by reference to when it became probable that Mtel would adopt the plan.[8]

In the case at bar, plaintiffs complain of defendants' "belated" disclosure of its strategic plan to slash prices. Yet plaintiffs are less than specific on the subject of *when* they contend disclosure should have been made. Defendants assert that plaintiffs' failure to allege this fact with specificity, as well as their failure to identify who knew this information and when, is fatal to any claim based on a failure to have earlier disclosed the plan. Plaintiffs, on the other hand, maintain that they cannot be required to plead facts that are exclusively within defendants' possession and control. Indeed, one would not necessarily expect the plaintiffs to be in a position to state the exact date that defendants' consideration of the plan became sufficiently advanced so as to give rise to a duty of disclosure. However, plaintiffs here have not identified even *generally* when defendants first began "actively" considering the plan. Nor have they suggested so much as a general time frame for when it became likely that the plan would be adopted (as, for example, whether this occurred before or after the PageNet announcement, or how long before or after the PageNet announcement).[9] The fact is, the plan was disclosed, and there is nothing in the complaint to support the conclusion that Mtel's failure to disclose the plan at an earlier time amounted to fraud.

■ Plaintiffs next charge both that Mtel's optimistic projections of growth and profitability were lacking a reasonable basis because defendants knew, yet failed to dis-

---

**8.** The fact that the plan was ultimately adopted and implemented does not establish materiality, for "[t]he probability of a transaction occurring must be considered in light of the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed." *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1127 (D.Del.1988).

**9.** In their brief (though not in their complaint), plaintiffs state "defendants had begun to ex-

plore—substantially before its ultimate disclosure on January 5, 1994—a 'strategic plan' to drastically reduce prices on SkyTel's products." It seems hardly likely that the plan was devised or adopted "substantially before" its ultimate disclosure. It is not reasonable to infer that Mtel would have drastically reduced its prices without a reason to do so; and there was no reason to do so until PageNet announced its planned pricing scheme on October 28, 1993.

close, *inter alia,* that "the substantial construction, development and other costs incurred by Mtel in connection with the NWN would negatively affect the Company's financial results on both a near and long-term basis." In fact, however, Mtel's previous disclosures on this subject were not inconsistent with Mtel's January 5, 1994 announcement that start-up losses from NWN would begin in the second half of 1995. In its 1992 Annual Report, Mtel stated:

> The Company anticipates that its existing sources of capital, together with cash flow from operations, which are expected to increase because of the anticipated growth in SkyTel's subscriber base, will be sufficient to meet projected requirements through the end of 1993. However, the Company cannot predict the extent to which additional capital may be required in connection with its international development efforts or the development of new technology such as its proposed two-way nationwide wireless messaging system. As a result, the Company may be required to incur additional indebtedness and engage in other financings, the timing, nature, amount and source of which cannot presently be determined.

More to the point, a June 25, 1993 New York Times article reported that Mtel hoped to launch its new NWN by July 1995, and cautioned that while analysts had projected profits as high as $.25 a share,

> those earnings will be from older SkyTel service. Setting up the new network, which will entail building paging sites in 300 markets, will cost about $100 million. Assuming the company can raise the necessary capital, *the outlay may lead to losses, the company concedes, when the services are initially launched.* (Emphasis added).

Additionally, a November 15, 1993 Alex Brown report warned:

> The biggest risk to owning the shares may be lack of earnings predictability over the next two years.
> —The biggest variables are expected to be the costs of international start-ups in 1994, mainly Columbia and Argentina, and the costs of the NWN in 1995.

Mtel's announcement on January 5, 1994 thus reiterated, or confirmed risks that Mtel had already disclosed, or which were otherwise known. Consequently, defendants can have no liability under Rule 10b–5 based on these allegations.

■ Plaintiffs argue that such cautionary language as that quoted above was too vague and nonspecific and was hardly adequate to overcome Mtel's consistently upbeat and glowing predictions for the company's future. A studied review of the complaint, however, reveals that in fact, few of the statements which plaintiffs cite actually related to Mtel's future prospects, and even fewer related to its prospects beyond the year 1993. Plaintiffs allege, for example, that Fugate was reported on April 22, 1993 to have projected that "Mtel's capital expenditures for 1993 would reach $35 million, *but then decline in 1994 to $20 million."* (Emphasis added). Then on June 14, 1993, a Barron's article reported Fugate as stating that "Mtel expects to remain profitable for all of this year *and to show even better results in 1994."* (Emphasis added). Yet plaintiffs' complaint sets forth no clear factual basis for concluding that there was no reasonable basis for a belief that these statements were true *when made.*

It was never less than clear that Mtel's future performance was directly tied to and dependent upon SkyTel's performance. And, when each of the statements was made concerning Mtel's future performance, SkyTel was the clear leader in the market for nationwide paging services. At that time, nothing had occurred to undermine SkyTel's competitive position. Manifestly, the primary factor by far which adversely affected SkyTel's prospects was PageNet's entry into the nationwide paging market. Yet plaintiffs allege no basis (specific or otherwise) for concluding that Mtel knew, or that it could or should have known when these predictions were made that PageNet would soon announce that it would enter the market. Thus, on what basis might one conclude that Mtel's predictions of SkyTel's—and hence its own—growth and profitability were other than well founded? Again, the potential for losses relating to the 1995 start-up of the NWN was

disclosed. The sole remaining basis for plaintiffs' charge that defendants' predictions lacked a reasonable basis is their allegation that Mtel knew, but failed to disclose, that "Mtel had incurred and would continue to incur significant start-up losses in connection with certain of its international ventures that would similarly impair the Company's near and long-term financial results." But plaintiffs do not allege when Mtel began to experience such losses in relation to the time of its announcement, nor do they specifically identify any previous statements that were rendered misleading by the failure to make these disclosures before January 5, 1994. Presumably plaintiffs mean to allege that defendants' predictions of profitability were false and misleading because of defendants' failure to disclose this fact. Yet they have not alleged or even intimated that such losses were experienced or anticipated *at any time when* Mtel was forecasting growth and profitability.

Plaintiffs' further allegation that defendants committed securities fraud by failing to disclose the fact that "Mtel was experiencing substantial cost over-runs in the development and construction of new products" and "a deterioration in its markets as a result of weakening economic conditions," are marked by similar deficiencies. Plaintiffs have not alleged which Mtel markets were deteriorating, how much they deteriorated, or when the deterioration occurred in relation to defendants' challenged statements and omissions. They have not identified which products were involved in the alleged cost overruns, how those alleged overruns affected (or had the potential to affect) the Company's overall performance, or when these occurred. Similarly general allegations were dismissed in *Tuchman v. DSC Communications Corp.*, 818 F.Supp. 971, 977 (N.D.Tex.1993), *aff'd,* 14 F.3d 1061 (5th Cir.1994), wherein the district court explained:

> Plaintiffs assert that "customer defections to DSC's competitors began to increase markedly, resulting in large-scale cancellation of orders, returns of equipment, and a fall-off in new orders." ... Plaintiffs fail to provide any facts to support these assertions. How many customers defected? Which customers? Which orders were cancelled? What equipment was returned? What figures demonstrate a fall-off in new orders? Plaintiffs' inability to distinguish facts from mere opinions and conclusions renders the Complaint insufficient to satisfy the particularity requirements of Rule 9(b).

Plaintiffs' allegation that defendants failed to disclose that "Mtel's business was not or would not be performing as well as had been previously internally budgeted because of increased advertising expenditures and financial concessions necessary to promote the sales of SkyTel's products" likewise fails to satisfy plaintiffs' pleading burden under Rule 9(b). That is, plaintiffs allege nothing about the timing of any such expenditures and concessions, or that this alleged revision in its internal budget was material. Moreover, Mtel could only have had a duty to publicly disclose a failure to perform as well as "previously internally budgeted" if such disclosure were required to correct a previous statement. *Cf. In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1115 (9th Cir.1989) (corporation may have had duty to disclose internal memoranda which directly contradicted optimistic statements regarding development and qualities of new product); *Debora v. WPP Group PLC,* No. 91 Civ. 1775 (KTD), 1994 WL 177291, at *6 (S.D.N.Y. May 5, 1994) (duty to disclose may arise if speaker "made a statement that would become inaccurate, incomplete or misleading without disclosure of additional information"). There is no allegation to that effect in the complaint.

For all of the foregoing reasons, the court concludes that plaintiffs have failed to adequately plead a claim for securities fraud against Mtel under Section 10(b) or Rule 10b–5. That claim will therefore be dismissed. Since liability under Section 20(a) of the Securities and Exchange Act can attach only if the controlled entity itself is liable for a securities law violation, then it follows that the claim alleged against the individual defendants as "control persons" must be dismissed. Finally, plaintiffs predicate this court's jurisdiction over their state law claim

on the doctrine of supplemental jurisdiction. Having now concluded that plaintiffs' federal claims should be dismissed, the court declines to exercise supplemental jurisdiction over plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3) (court may decline supplemental jurisdiction over state claims if it "has dismissed all claims over which it has original jurisdiction").

Accordingly, for all of the foregoing reasons, it is ordered that defendants' motion to dismiss is granted. It is further ordered that all remaining motions, including plaintiffs' motion for class certification, are hereby denied as moot.