**In re MCI WORLDCOM, INC.
SECURITIES LITIGATION**

No. CIV.A. 3:00–CV–833BN.

United States District Court,
S.D. Mississippi,
Jackson Division.

March 29, 2002.

Don John W. Barrett, Richard Runft Barrett, Jesse M. Harrington, Barrett Law Offices, Lexington, MS, Samuel H. Rudman, Melvyn I. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, Deborah R. Gross, Law Offices Bernard M. Gross, P.C., Philadelphia, PA, Kenneth J. Vianale, Maya Saxena, Millberg, Weiss, Bershad, Hynes & Lerach, LLP, Boca Raton, FL, for Harriet Goldstein, Vincent Pinto, all others similarly situated, plaintiffs.

Jesse M. Harrington, Barrett Law offices, Lexington, MS, for Vincent J. Moleta, Michael Sabbia, Wayne County Employees Retirement system, David Klein, Simms Family, City of Lakeland Employee Pension Fund, plaintiff.

R. David Kaufman, Martin Patrick McDowell, Brunini, Grantham, Grower & Hewes, Jackson, MS, Thomas F. O'Neil, III, Adam H. Charnes, Worldcom, Inc.— Legal Division, Washington, DC, Michael J. Chepiga, Paul C. Curnin, Simpson, Thacher & Bartlett, New York, NY, for MCI Worldcom, Bernard J. Ebbers, Scott D. Sullivan, defendants.

## OPINION AND ORDER

BARBOUR, District Judge.

This cause is before the Court on the Motion of Defendants to Dismiss. Having considered the Motion, Response, Rebuttal, attachments to each, and supporting and opposing authority, the Court finds that the Motion is well taken and should be granted.

### I. Background and Procedural History

WorldCom is an international telecommunications company that provides its customers with voice, data, internet and international communications services. With its purchase of MCI Communications Corp. ("MCI"), in September of 1998, WorldCom became the second largest telecommunications company in the United States. In October of 1999, WorldCom agreed to purchase Sprint, the third largest telecommunications company in the United States, in a stock-for-stock purchase that was ultimately blocked by United States and European antitrust regulators in July of 2000.

Between February 11, 2000, and November 1, 2000, the stock prices of WorldCom and its two largest competitors, AT & T and Sprint, fell precipitously: the price of AT & T stock fell 55%, or $27 per share, to approximately $22; the price of WorldCom stock fell 74%, or $50 per share, to approximately $18; and, the price of Sprint stock fell 64%, or $41 per share, to approximately $23. During this period, the price of WorldCom stock reached a 52-week low following the October 26, 2000, issuance by Defendants of a press release reporting lower than expected third quarter 2000 revenues, decreased growth in the internet division UUNet, and a write-off of $685 million for certain accounts deemed uncollectible. On November 1, 2000, the date on which WorldCom issued an earnings warning and announced in a special meeting with analysts the creation of a tracking stock to contain certain assets it had obtained through the MCI acquisition, the price of WorldCom stock fell 20%. At the November 1, 2000, meeting with analysts, WorldCom chief executive officer Bernard J. Ebbers ("Ebbers") apologized for "let[ting] you as investors down," and stated, "[T]he management team of this company is not at all satisfied with where we are today." Motion, Exhibit "16," Transcript of November 1, 2000, Analyst Meeting.[1]

Following Ebbers' statement and the October 26, and November 1, 2000, announcements of WorldCom, Plaintiffs filed separate securities fraud complaints against WorldCom, Ebbers, and chief financial officer Scott D. Sullivan ("Sullivan") in Mississippi, New York and Washington, D.C. Their actions were consolidated by this Court on March 27, 2001, and Plaintiffs filed their Consolidated Amended Class Action Complaint on June 1, 2001. Plaintiffs seek to represent a class consisting of all persons who purchased the common stock of WorldCom between February 10, 2000, and November 1, 2000, inclusive, and allege that WorldCom made material misstatements and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs also allege that Defendants Ebbers and Sullivan were liable in their individual capacities as "controlling persons" under section 20(a) of the Securities Exchange Act.

With the instant Motion, Defendants urge the Court to dismiss Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, and under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("Reform Act"), 15 U.S.C. § 78u-4(b), for failure to plead fraud with particularity. The Court has painstakingly examined the 110 page, 285 paragraph Complaint. The Complaint is replete with cross-references and repetition. On first reading, the instinctive reaction is exactly what is intended by Plaintiffs. The numbers are so large, the stakes were so high, and the fall of the dollar value of WorldCom stock so precipi-

---

1. In ruling on the instant Motion, the Court has only considered the pleadings and documents incorporated in the Complaint, or relied upon by Plaintiffs in their Complaint and attached by Defendants to the Motion to Dismiss. Thus, the Court treats the instant Motion as a motion to dismiss and not a motion for summary judgment. *See Rubinstein v. Collins*, 20 F.3d 160, 162 n.5 (5th Cir.1994). *See also Cortec Indus., Inc. v. Sum Holding*

*L.P.*, 949 F.2d 42, 47 (2d Cir.1991) (finding that, "[w]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure").

tous, that the reader reacts by thinking that there must have been some corporate misbehavior. However, after a thorough examination, it becomes apparent that the Complaint is a classic example of "puzzle pleading" and that it does not attain the heightened pleadings requirements for this type case. The Court hereafter addresses each statement made by the corporation and the individual Defendants upon which Plaintiffs rely.

## II. Legal Standard

For the purposes of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, all material allegations in Plaintiffs' Complaint must be taken as true and construed in the light most favorable to Plaintiffs. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). A Rule 12(b)(6) dismissal is not appropriate unless it appears to a certainty that Plaintiffs would not be entitled to relief under any set of facts that could be proven. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rule 12(b)(6) requires dismissal upon such a finding by the Court. *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.* 804 F.2d 879, 881 (5th Cir.1986) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

## III. Analysis

### A. Applicable Laws

Rule 10b–5 provides:

Employment of Manipulative and Deceptive Devices:

It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Similarly, section 10(b) of the Security Exchange Act provides that it is unlawful

to use or employ [by any means or instrumentality of interstate commerce], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

### B. Elements of a Claim under Section 10(b) and Rule 10b–5 and Pleading Requirements Under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995

To state a claim for securities fraud under section 10(b) of the Securities Exchange Act and Rule 10b–5, a plaintiff must allege, "in connection with a purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 407 (5th Cir.2001) (quoting *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.

1994)). A claim for securities fraud is subject to the heightened level of pleading established by Rule 9(b) of the Federal Rules of Civil Procedure and must be set forth "with particularity." *See Tuchman,* 14 F.3d at 1067. Under Rule 9(b), plaintiffs must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir. 1997). The heightened pleading standard "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and good will, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman,* 14 F.3d at 1067.

■ The pleading requirements of Rule 9(b) were reinforced by the 1995 passage of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b). Under the Reform Act, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, the Reform Act requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2), that is, a "strong inference of either intentional misconduct or severe recklessness." *See Nathenson,* 267 F.3d at 409. "Strong inference" requires pleading of facts that "constitute persuasive, effective, and cogent evidence from which it can be logically deduced that defendants acted with intent to deceive, manipulate or defraud." *Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417,

422 (N.D.Tex.2000). Thus, to "survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b–5 claim must ... plead specific facts giving rise to a 'strong inference' of scienter." *Nathenson,* 267 F.3d at 407 (quoting *Tuchman,* 14 F.3d at 1067).

### C. Inactionable Statements of, or Attributed to, Defendants

Plaintiffs allege that statements contained in the (1) press releases of February 10, 2000, April 27, 2000, May 18, 2000, July 18, 2000, and July 27, 2000, (2) analyst conference calls of February 10, 2000, and April 27, 2000, (3) March, 2000, annual report to shareholders, (4) 1999 Form 10–K, (5) May 15, 2000, and August 14, 2000, Form 10–Q, and (6) May 12, 22, and 27, 2000, debt offering prospectuses, are false and misleading. The Court finds that, for the reasons listed below, certain of these statements are inactionable as a matter of law.

### 1. Statements of Third Parties Attributed to Defendants

Plaintiffs allege that WorldCom issued a press release on May 18, 2000, "indicating that Duff & Phelps Credit Rating Co. issued a rating of 'A-' for WorldCom's soon to be issued multi-billion senior debt offering." Complaint ¶ 168. The press release set forth the strength of the competitive position of WorldCom, the strong earnings before interest, taxes, depreciation and amortization ("EBITDA"), growth of WorldCom, and the expected revenues of a merged WorldCom and Sprint. Plaintiffs also allege that, in its July 18, 2000, press release, WorldCom stated that: (1) "despite the cancellation of the Merger [with Sprint], WorldCom would 'push ahead with plans to expand overseas,'" (2) it intended to "extend its data relay service to 45 countries, widen its ATM geographic footprint in foreign markets, and undertake

private line expansion in 26 Asian and European countries," and, (3) "Generation D" services "form[ed] the underlying infrastructure of e-business and e-commerce" and that with this statement regarding "Generation D," WorldCom "re-emphasized a push toward expanding the 'Generation D' product line to overseas customers." Complaint ¶ 174.

Plaintiffs argue that each of these press releases contained materially false and misleading statements in violation of federal securities law. Defendants argue that the statements referenced in paragraphs 168 and 174 of the Complaint, which were attributed to them, were not released to the press by WorldCom, but, instead, were contained in press releases issued by Duff & Phelps Credit Rating Co. and the Associated Press, respectively. *See* Motion.

■ "Opinions and predictions expressed by persons or entities other than the Defendants .... are not properly the subject of a claim for securities fraud against Defendants." *In re Mobile Telecomm. Techs. Corp. Sec. Litig.*, 915 F.Supp. 828, 833 (S.D.Miss.1995) (Lee, J.). For Defendants to be liable for these third party statements, Plaintiffs must show that Defendants "exercised the kind of control over the [persons or entities that made the statements] that would render [them] liable for [the] statements...." *Id.* (quoting *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993)). As Plaintiffs have not pled specific facts connecting Defendants to any of the statements and predictions contained in the press releases of May 18, 2000, and July 18, 2000, the Court finds that these statements cannot provide a basis for a federal securities fraud claim.

### 2. Statements of Historical Fact

■ A claim of securities fraud may not be based on accurate statements of historical facts. *See In re Mobile Telecomm.,*

915 F.Supp. at 832–34. *See also In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993); *Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 909 (N.D.Ill.2001). The Court finds that the following statements are accurate statements of historical facts and, therefore, are not actionable as a matter of law:

- "At the time it was announced in 1997, the merger with MCI, valued at approximately $40 billion, was the largest in history," Complaint ¶ 129 (statement of Defendant Ebbers in March, 2000, letter to shareholders); and,

- "Both companies were leaders in transforming the industry from a monopoly utility business into an intensely competitive market." *Id.*

Note: Throughout this Opinion, the indented paragraphs designated with "bullets" are the statements taken from the corporate documents or made by the individual defendants which Plaintiffs allege in their Complaint are actionable.

### 3. Statements Too Vague to Support a Claim of Securities Fraud

■ Vague statements of corporate optimism do not provide a foundation for a securities fraud claim. *See In re Mobile Telecommunication Tech. Corp. Sec. Litig.*, 915 F.Supp. at 834. *See also, Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997) (finding that "[v]ague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions"); *Raab*, 4 F.3d at 289, n. 1 (finding that "soft, 'puffing' " statements are immaterial as a matter of law); *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, *2 (S.D.N.Y. 2001) (finding that " 'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud"); *Tarica v. McDermott Intern., Inc.*, 2000 WL

1346895 at \*6 (E.D.La.2000) (finding that "general sentiment of optimism is mere puffery and does not give rise to a federal securities claim"). The Court finds the following statements to be puffery and/or vague statements of corporate optimism on which a federal securities fraud claim cannot lie:

- "Our achievements in the quarter and full year 1999 were outstanding given the dramatic changes impacting communications services," Complaint ¶ 47 (statement of Defendant Ebbers made during February 10, 2000, conference call);

- "Our proven ability to deliver this type of revenue growth, along with industry leading earnings growth is our mark of distinction," *id.;*

- "Our accomplishments in 1999 are impressive," *Id.* at ¶ 50;

- "[W]e substantially strengthened our business through acquisitions and divestitures," *id.;*

- "I'm proud of how former MCI and WorldCom employees have worked together to accomplish so much, it hasn't always been easy. Our success with the MCI integration should give you comfort with the Sprint transaction. We know how to put companies together and get the most out of them," *id.;*

- "The early successes we have achieved in Internet and data services, coupled with the corresponding capital investments have positioned us to lead the industry in the transaction to an 'all-distance' advanced communications services platform," *id.;*

- "[W]e have confidence in our ability to lead the industry in this transaction, and a track record of accomplishing it profitably," *id.;*

- 1999 was an "outstanding performance year," *Id.* at ¶ 51;

- "[O]ur Internet business continues to enjoy great success, with customers ordering ever greater amounts of bandwidth," *id.;*

- "Based on where we exited 1999 we feel every bit of confidence for 2000 analysts' expectations, top to bottom," Complaint ¶ 54 (statement of Defendant Sullivan made during February 10, 2000, conference call);

- "[W]e had a busy year in 1999. It was a year of significant accomplishments. We integrated MCI and WorldCom. We delivered on our synergy plan. We delivered on our operating plan.... On top of all the accomplishments, we delivered on the day-to-day business and our earnings targets," *id.;*

- "The fundamentals of our business remain strong," *id.;*

- "Clearly the synergy and growth opportunities presented in our business combinations are driving these improvements. Our results highlight the importance of having an industry-leading cost structure, especially in a rapidly changing marketplace," *id.;*

- "We are leading the charge into this new era. How did we do it? Over the years, we have targeted investments and acquisitions toward the fastest growth areas of communications services," Complaint ¶ 126 (statement of Defendant Ebbers in March 20, 2000, letter to shareholders);

- "Our successful merger with MCI in part drove these results, which should be a great indication of how the Spring merger should benefit the Company," *id.* at ¶ 127;

- "1999 was an outstanding year for WorldCom," *id.* at ¶ 128;

- "Our data, Internet and international business led us to record revenue growth," *id.;*
- "The MCI integration ran ahead of schedule and helped us accomplish exceptional growth in profitability," *id.;*
- "The local and global reach of our network continues to set WorldCom apart from the rest of the industry," *Id.;*
- "WorldCom knows how to make mergers work," *id.* at ¶ 129;
- "The MCI merger led to increased shareholder value, because the power and efficiency of the merged company are greater than the two companies working separately. Thus, value was captured in anticipated synergies. It also joined two companies with highly complementary strengths and assets," *id.;*
- "WorldCom continues to enjoy success in its focus markets," Complaint ¶ 146 (April 27, 2000, Press Release);
- "We are clearly leading the communications industry into a new era dominated by data- and Internet-based services, and our newly announced generation d initiatives leverage our existing strengths," *id.,*
- "The investments that we are making in these fast growing areas are driving our growth as we lead our industry's transition to all-distance services," *Id.* at ¶ 148;
- "We continue to expect strong growth from our data, Internet and international business in 2000," *id.;*
- "We are achieving our results profitably," Complaint ¶ 149 (statement of Defendant Ebbers made during April 27, 2000, conference call);
- "Our network and operations group did a great job in implementing the latest technological innovations to in-

crease the capacity and reach of our networks, positioning us to capture more revenue and drive line costs lower to keep the bottom line moving," *id.;*
- Defendant Ebbers' statement that "he expected both Sprint and WorldCom to approve the merger on April 28, 2000," and announcement that "the Company expected to have discussions with respect to FCC and European Community 'wrapped up' in a 'couple of months,'" *id.* at ¶ 150;
- Defendant Ebbers' statement that "the Company 'remains comfortable' with analysts' estimates of ... revenue growth estimates for 2000," *id.;* and,
- "WorldCom posted a strong quarter with record revenue and record profits," *Id.* at ¶ 178.

**4. Forward–Looking Statements Protected by the Safe Harbor Provision of the Reform Act**

▉ The Reform Act contains a "safe harbor" provision protecting forward-looking statements. This statute provides that a company cannot be liable

> if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or [is] immaterial.

15 U.S.C. § 78u–5(c)(1)(A). A defendant cannot be liable for a forward-looking statement unless the plaintiff establishes that the defendant had actual knowledge that the statement was false or misleading when made. 15 U.S.C. § 78u–5(c)(1)(B).

The definition of a forward-looking statement includes projections of revenue

or earnings, plans and objectives for future operations, statements of future economic performance, and any assumption underlying or relating to any other forward-looking statement. *See* 15 U.S.C. § 77z–2(i)(1); 15 U.S.C. § 78u–5(i)(1). Moreover, federal courts addressing forward-looking statements have held that where the statements constitute vague sales "puffery," defendants will not be liable for such statements merely because the projection is never realized. *See Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) ("projections of future performance not worded as guarantees are generally not actionable under the federal securities laws"); *Marion Merrell Dow, Inc., Securities Litig. II*, 1994 WL 396187 at *5 (W.D.Mo.1994) (projections that company was looking forward to growth in earnings per share were "vague soft puffing statements" that could not have been reasonably relied upon as a guarantee); *In re Northern Telecomm. Ltd. Secs. Litig.*, 1994 WL 455534 at *7 (S.D.N.Y.1994) (optimistic description of "flagship products" and the company's "leadership position" were not materially misleading).

As Plaintiffs have not presented any evidence that Defendants had actual knowledge that the following statements were false or misleading when made, the Court finds that the following statements are forward-looking statements protected by the safe harbor provision of the Reform Act:

- "The investments in 1999 will provide future revenue growth and wireless data capabilities that will become increasingly more important as the Internet goes mobile," Complaint ¶ 50 (statement of Defendant Ebbers made during February 10, 2000, conference call that was identified as forward-looking in the February 10, 2000, press release, *see* Motion, Exhibit "6," and prefaced by comments warning of the forward-looking na-

ture of the statement, *see* Motion, Exhibit "7");

- "I hope you can sense the energy and confidence we enter the year 2000 with. With the best employee base in the industry, we will achieve the results expected of us," Complaint ¶ 55 (statement of Defendant Ebbers made during February 10, 2000, conference call that was identified as forward-looking in the February 10, 2000, press release, *see* Motion, Exhibit "6," and prefaced by comments warning of the forward-looking nature of the statement, *see* Motion, Exhibit "7"); and,

- "[I]n fact, we have indications in the first quarter that some of this growth may be accelerating," Complaint ¶ 151 (statement of Defendant Ebbers made during April 27, 2000, conference call and prefaced by comments warning of the forward-looking nature of the statement, *see* Motion, Exhibit "11").

## D. Have Plaintiffs Stated a Claim of Securities Fraud?

Plaintiffs, in essence, allege that the subject statements of Defendants relating to the financial condition of WorldCom were false when made because Defendants "cooked the books," that is, Defendants artificially boosted revenue by: (1) failing to take necessary write-offs in order to avoid charges to earnings, *see* Complaint ¶¶ 58–72, (2) intentionally misrepresenting rates to customers, *see id.* at ¶¶ 74–81, (3) slamming customers, that is, switching customers' long distance service to WorldCom without customer approval, *see id.* at ¶¶ 82–83, (4) recognizing revenue from accounts which had been closed by customers, *see id.* at ¶¶ 84–87, (5) double-billing customers, *see id.* at ¶¶ 91–92, (6) backdating contracts to recognize additional

revenue at the end of a fiscal quarter, *see id.* at ¶¶ 97, (7) failing to properly account for contracts which had been renegotiated or discounted, *see id.* at ¶¶ 93–96 and 98–99, and (8) deliberately understating expenses. *See id.* at ¶ p. 88–90. Plaintiffs further allege that the statements of Defendants regarding network expansion capabilities, *see id.* at ¶¶ 109–118, the development of "Generation D," *see id.* at ¶ 163, the success of UUNet, *see id.* at ¶¶ 106–08, and the success of the merger with and integration of MCI as evidenced by the creation of a tracking stock, *see id.* at ¶¶ 140 and 177, were false when made.

Additionally, Plaintiffs allege that certain of the subject statements of Defendants were false when made because of non-disclosures by Defendants. Specifically, Plaintiffs allege that Defendants (1) failed to disclose in their public filings with the Securities Exchange Commission ("SEC") the impact of Staff Accounting Bulletin ("SAB") 101 prior to their filing of Form 10–K for the year 2000 as required by Accounting Principles Board ("APB") Opinion No. 22, *see id.* at ¶¶ 255, 259 and 262, and (2) failed to disclose adverse trends in their public filings with the SEC as required by Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.303. *See* Complaint at ¶¶ 265.

However, as to the following claims, the Court finds that, as Plaintiffs did not address the assertions of Defendants that they should be dismissed, these claims have been abandoned:

- "Defendants' statements . . . describing the success of WorldCom's Internet division [UUNet] were materially false and misleading," Complaint ¶ 106;
- "Defendants' statements . . . describing the Company's strong growth and expansion were materially false and misleading because, as defendants knew or recklessly disregard-

ed, WorldCom's growth was severely hampered by its inability to add additional network capacity in a timely fashion," *id.* at ¶ 109;

- "Defendants' financial results included in the 10–K and Annual Report to shareholders were . . . false because defendants caused employees to engage in improper revenue recognition practices and/or knowingly acquiesced in and condoned" the following practices: intentionally misrepresenting service rates and features to customers, slamming, refusing to cancel customer accounts, double-billing, and back-dating of contracts, *id.* at ¶ 138;
- "Defendants' statements discussing the new 'Generation D' initiative . . . were also materially misleading . . . . [in that] the Company had no products built for General D in early 2000, and lacked the capacity to build the web hosting products they publicly announced. In addition, the Company could not bill for the web hosting services even if it did have the products . . . ." *id* at ¶ 163;
- "The fact that MCI never successfully merged with WorldCom was confirmed by the Company's November 1, 2000, announcement creating a separate 'tracking stock' for MCI, despite touting the unified nature of MIC [SIC] and WorldCom during the Class Period," *id.* at ¶ 140. *See also id.* at ¶ 177;
- "The non-disclosures in the 1999 Form 10–K and the first quarter 2000 Form 10–Q, and the disclosure in the second quarter 2000 Form 10–Q . . . , were materially false and misleading because, at all relevant times, Defendant knew and concealed the fact that the implementation of SAB 101 would have a ma-

terial ... effect on the Company's financial performance," *id.* at ¶ 255; and

- "[A]t no time during the Class Period did the defendants discuss ... known adverse trends in the Company's public filings with the SEC as required by" SEC Regulation S–K, 17 C.F.R. § 229.303. *Id.* at ¶ 265.

*See Coates,* 26 F.Supp.2d at 914 n. 1 (finding that, in a motion to dismiss, only arguments addressed in the response brief are "preserved for court review"). *See also Alicea v. Grenada County,* 1997 U.S. Dist. LEXIS 9919, *7 n. 4 (N.D.Miss.1997).

Therefore, the only remaining unaddressed claim before the Court is Plaintiffs' claim that the statements of Defendants regarding the financial status of WorldCom were false or misleading because Defendants knowingly, or with reckless disregard, failed to timely write-off certain uncollectible accounts.

### 1. Was the Failure of Defendants to Write-off Uncollectible Accounts Prior to November 1, 2000, Fraudulent?

█ Stated most simply, Plaintiffs allege that Defendants issued statements regarding the financial status of WorldCom which were false or misleading because certain uncollectible accounts remained on the books. The reason the accounts were kept on the books, Plaintiff argue, was to boost the stock price of WorldCom in anticipation of its merger with first Sprint and then Intermedia. Had Defendants written off the accounts sooner rather than later, Plaintiffs argue that they would have been forewarned of the true financial condition of WorldCom and would not have been lured into buying stock at a price they allege was fraudulently inflated. Plaintiffs urge the Court to find that (1) the failure of Defendants to comply with Generally Accepted Accounting Principles

("GAAP") in writing off the accounts caused "the amount of receivables reflected on the Company's financial statements [to be] materially overstated," Complaint ¶ 243, which in turn, caused the statements regarding the financial status of WorldCom to be false or misleading, and (2) the timing and size of the write-off is indicative of fraudulent intent. Plaintiffs also urge the Court to find that Ebbers' knew that accounts totaling at least $325 million needed to be written-off and that, his failure to approve the write-off prior to October 26, 2000, is evidence of fraud. *See id.* at ¶ 60.

As for Ebbers' actual knowledge that certain accounts were uncollectible and should have been written off, Plaintiffs argue that:

- . The legal group in the credit department of WorldCom based in Tulsa, Oklahoma, regularly generated memoranda listing accounts involved in litigation or bankruptcy proceedings, *see id.* at ¶ 59;
- The memoranda were distributed to, among others, David Myers ("Myers"), the Controller of World-Com, *see id.;*
- Myers reported directly to Defendants Sullivan and Ebbers. *see id.* at ¶¶ 6, 59;
- Write-offs of more than $25 million could only be approved by Ebbers;
- Therefore, Ebbers "knew" as early as March of 1999 that "three large wholesale accounts [totaling $100 million had] filed for bankruptcy protection" and were thus "uncollectible." *See id.* ¶¶ 61(b), 70.

Plaintiffs do not plead but merely assume that, because Myers reported directly to Ebbers and only Ebbers could approve write-offs of more than $25 million, a recommendation that the subject accounts

be written-off was actually presented to, and rejected by, Ebbers. Plaintiffs are not entitled to make such an assumption under the heightened pleading requirements of this case. The Court therefore finds that Plaintiffs have not adequately pled actual knowledge or conscious misbehavior on the part of Ebbers such as would support a finding of scienter. Thus, as previously stated, to "survive [the instant] motion to dismiss, [Plaintiffs must] ... plead specific facts giving rise to a 'strong inference' of scienter." *Nathenson*, 267 F.3d at 407 (quoting *Tuchman*, 14 F.3d at 1067). For the reasons that follow, the Court finds that Plaintiffs have not satisfied this heightened pleading burden and, therefore, have not stated a cognizable claim for securities fraud.

 Plaintiffs argue that Defendants "knew or were severely reckless in not knowing that [certain] ... accounts should have been written-off much sooner." *See* Response. However, the United States Court of Appeals for the Fifth Circuit has held that "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999). *See also DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) (finding, "If all that is involved is a dispute about the timing of a writeoff, based on the estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence"); *Kriendler v. Chemical Waste Mgmt., Inc.*, 877 F.Supp. 1140, 1154 (N.D.Ill.1995) (finding, "Timing, alone, cannot support an inference of fraud"). Rather, to establish scienter based on improper accounting, Plaintiffs must plead with particularity facts demonstrating that "the accounting judgments that were made were such that no reasonable accountant would have made the same decision if confronted with the same facts." *In re Miller Indus., Inc.*, 120

F.Supp.2d 1371, 1382 (N.D.Ga.2000). The Court finds that Plaintiffs have not pled facts showing that the decision of Defendants to write-off the subject accounts on October 26, 2000, rather than on an unspecified earlier date as Plaintiffs contend, was unreasonable. The Court therefore finds that Plaintiffs have not pled facts which raise a strong inference of scienter based on the alleged failure of Defendants to timely write-off the uncollectible accounts.

Plaintiffs also argue that the timing and magnitude of the October 26, 2000, write-off of uncollectible accounts by WorldCom demonstrates scienter. *See* Response. Plaintiffs rely on *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir.2001), for the proposition that the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" is circumstantial evidence that the statements were false and misleading when made. *See* Response. The court in *Helwig* actually found that "the closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" is one of nine factors that are *"relevant* to scienter." *Helwig*, 251 F.3d at 552 (emphasis added). The statement to which Plaintiffs refer with their argument that the timing of the October 26, 2000, write-off evidences fraudulent intent was made by Defendants on August 14, 2000, more than ten weeks before the write-off by Defendants. Other courts faced with similar allegations have found that statements made closer in time than the subject statement did not support an inference of scienter. *See In re Paracelsus Corp. Sec. Litig.*, 61 F.Supp.2d 591, 600 (S.D.Tex.1998) (finding that less than eight weeks was not sufficiently close in time to support an inference of scienter); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 995 (1st Cir.1996) (finding five weeks to be insufficiently close in time); *San Leandro*

*Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies,* 75 F.3d 801, 812 (2d Cir.1996) (finding three weeks to be too remote in time to support an inference of scienter). Moreover, "[t]he short time frame between an allegedly fraudulent statement or omission and a later disclosure of inconsistent information does not, standing alone, provide a sufficient factual grounding to satisfy Rule 9(b)." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1225 (1st Cir.1996). The Court therefore finds that the timing of the write-off by Defendants does not support an inference of scienter.

■ As for the "magnitude" of the October 26, 2000, write-off, Plaintiffs contend that the sheer size of the write-off by WorldCom evidences fraudulent intent. *See* Response. Plaintiffs argue that, with total reserves of "only $1.12 billion," the pre-tax write-off of $685 million, or 62% of total reserves, is probative of severe recklessness. Defendants argue that, since the $685 million write-off represented only 1.7% of revenues, and that a larger write-off of $768 million had been taken in 1999, the size of the October 26, 2000, write-off does not give rise to a strong inference of scienter. *See* Rebuttal. *See also* Motion, Exhibit "1," 1999 Form 10–K; Motion Exhibit "29." Whether the Court determines magnitude by percentage of reserves or percentage of revenue, the Court comes to the same conclusion: the size of the October 26, 2000, write-off by Defendants does not by itself or in the context of the facts alleged by Plaintiffs, raise a strong inference of scienter. *See In re MicroStrategy Inc. Secs. Litig.,* 115 F.Supp.2d 620, 635–36 (E.D.Va.2000) (finding that, misstatements of "breathtaking" magnitude lend inferential weight to a bare allegation of GAAP violations).

### 2. Do the Motives to Commit Fraud Alleged by Plaintiffs Raise a Strong Inference of Fraud?

■ Plaintiffs allege that Defendants were motivated to issue false and misleading statements in order to facilitate the merger with Sprint, maintain a high credit rating for the public bond offerings of May 12 and May 22, 2000, and maximize the returns on the insider trades of Defendants Sullivan and Ebbers. *See* Response. Prior to the passage of the Reform Act, such allegations of motive might have been sufficient to support an inference of fraud. *See Lovelace,* 78 F.3d at 1018 (citing *Tuchman,* 14 F.3d at 1068 and stating that allegations of facts were sufficient to support an inference of fraud if they either (1) showed a defendant's motive to commit securities fraud, or (2) identified circumstances that indicated conscious behavior on the part of the defendant). Pleading motive to commit securities fraud is no longer enough to support the *strong* inference of fraud which must be pled under the Reform Act, however. *See Nathenson,* 267 F.3d at 412 (holding that, "simply because motive and opportunity is alleged does not of itself automatically and categorically mean that the necessary strong inference of scienter is present"). Allegations of motive and opportunity may, in certain cases, "enhance the strength of the inference of scienter," but standing alone, motive and opportunity are rarely "sufficiently persuasive to give rise to a [strong inference of] scienter...." *Id.*

Plaintiffs allege that "[o]ne of the reasons defendants falsified WorldCom's financial results was to guarantee Sprint shareholders would vote to accept WorldCom's merger offer. Acquiring Sprint was a powerful incentive" to commit securities fraud. *See* Response. Plaintiffs also argue that "Defendants' use of WorldCom stock as currency to purchase Sprint

provides additional circumstantial evidence of fraudulent intent." *Id.* The Court does not agree with either of Plaintiffs' contentions. Allegations that Defendants used stock as currency and that WorldCom falsified its financial status to "guarantee" approval by Sprint shareholders of the proposed merger, do not support a strong inference of scienter. Here, as in *Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1361 (S.D.Fla.1998), Plaintiffs "only cite the more general motives of maintaining the stock price in order to ... facilitate mergers and acquisitions. Because such motives can be ascribed to virtually all corporate officers and directors, they fail to raise a strong inference of knowing or reckless conduct." *See also In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 n. 4 (S.D.N.Y.1998) (finding, "Desire to consummate corporate transaction does not constitute a motive for securities fraud"). "General allegations of motive are insufficient to plead scienter for a § 10(b) claim." *Calliott v. HFS Inv.*, 2000 WL 351753, *8 (N.D.Tex.2000). The Court therefore finds that, with regard to their argument that the planned merger with Sprint motivated Defendants to commit fraud, Plaintiffs have not pled facts which raise a strong inference of scienter.

Plaintiffs also argue that the date on which Defendants released the subject statements regarding the financial status of WorldCom, that is, April 27, 2000, the day before Sprint shareholders voted on the proposed merger with WorldCom, is indicative of fraud. The Court finds that, as Sprint shareholders were required to mail in their votes on the merger with WorldCom and only those received by April 28, 2000, were counted in the vote on the merger, the WorldCom press release of April 27, 2000, could not have affected the outcome of the April 28, 2000, vote by Sprint shareholders. *See* Rebuttal, Appendix "D," Joint Proxy Statement at 32. Accordingly, the Court finds that the timing of the April 27, 2000, press release does not raise any inference of scienter.

With regard to Plaintiffs' allegation that the inside trades of Defendants Sullivan and Ebbers were motivated to commit securities fraud, the facts are as follows. On August 1, 2000, Defendant Sullivan exercised 475,000 options and sold the shares for approximately $9.9 million. *See* Complaint ¶¶ 180, 211. Sullivan's sale of 475,000 shares represented approximately 20% of his holdings of WorldCom stock. *See* Motion, Exhibit "2." On September 28, 2000, Defendant Ebbers was forced to sell 3,000,000 shares of WorldCom stock for approximately $27 million to meet a margin call. *See* Complaint ¶ 192. Ebbers' sale of 3,000,000 shares represented approximately 11% of his holdings of WorldCom stock. *See id.* Plaintiffs allege that these stock sales are "suspicious" and thus contribute to a strong inference of scienter. *See* Response. The Court does not agree.

 It is well settled that an unusual or suspicious insider stock sale may, under some circumstances, support a strong inference of scienter. *See In re Silicon Graphics Inc. Sec. Litig.*, 970 F.Supp. 746, 767 (N.D.Cal.1997). *See also In re Baker Hughes Sec. Litig.*, 136 F.Supp.2d 630, 646 (S.D.Tex.2001); *Coates v. Heartland Wireless Comm., Inc.*, 26 F.Supp.2d 910, 920 (N.D.Tex.1998). In determining whether a stock sale is unusual or suspicious, the Court must consider (1) the amount and percentage of shares sold by the insider, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999). Plaintiffs admit that Ebbers' September 28, 2000, sale of WorldCom stock was a "forced" sale. *See* Response at 33. A forced sale of stock does not, however, raise a strong

inference of scienter. *See Coates*, 26 F.Supp.2d at 920 (finding no scienter when insider sale was made to meet a margin call). The Court therefore finds that Ebbers' sale of WorldCom stock on September 28, 2000, does not support a finding of scienter.

■ Sullivan's August 1, 2000, sale was not suspicious for either its size or volume, but is comparable to his sales of World-Com stock in 1995, 1997 and 1999, *see* Motion, Exhibit "27," and represented only 20% of his WorldCom holdings. *See Nathenson*, 267 F.3d at 420 (finding that sale of 18.5% of holdings was not "unusual"). The Court therefore finds that Plaintiffs' allegations regarding the inside stock sales of Ebbers and Sullivan do not contribute to a strong inference of scienter.

■ Plaintiffs also argue that Ebbers' desire to increase his incentive compensation, which was tied in part to the price of WorldCom stock is indicative of scienter, and that the bond sales of May 12, and May 22, 2000 are "powerful evidence of WorldCom's motive to defraud." *See* Response. The Court finds no merit in Plaintiffs' arguments on these points. The Fifth Circuit in *Nathenson* found that, "allegations that corporate officers ... would benefit from enhancing the value of their stock and/or stock options [are] ... insufficient to support a strong inference of scienter." *Nathenson*, 267 F.3d at 420 (citing *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir.1994)). The Court therefore finds that Plaintiffs' allegations regarding Ebbers' desire to increase his compensation do not contribute to a strong inference of scienter.

■ As for Plaintiffs' allegation that the public offerings of corporate bonds conducted by WorldCom on May 12 and 22, 2000, to refinance existing corporate debt evidence a motive to defraud, the Fifth Circuit also found in *Nathenson* that "allegations that ... the corporation would benefit by receiving more for its shares to be issued in [a] public offering are insufficient to support a strong inference of scienter." *Id.* The Court has already found no scienter with regard to Plaintiffs' allegations that WorldCom falsified its financial status to guarantee approval by Sprint shareholders of the merger of the two companies. *See* above section III.D.2. The statements allegedly supporting each of these claims by Plaintiffs are the same. So, too, is the Court's conclusion. Plaintiffs' allegations regarding the public bond offerings of WorldCom do not contribute to a strong inference of scienter.

As Plaintiffs have not pled scienter with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure or as required by the Reform Act, the Court finds that Plaintiffs' claims under Section 10(b) of the Securities Act and Rule 10b–5 are not well taken and should be dismissed.

### E. Plaintiffs' Claims under Section 20(a) of the Securities Exchange Act

Section 20(a) of the Securities Exchange Act provides in pertinent part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...." 15 U.S.C. § 78t. As there can be no liability under section 20(a) without first a finding that a provision of the Securities Exchange Act has been violated, and having found that Plaintiffs have not stated a claim under Section 10(b) of the Securities Exchange Act or Rule 10b–5, the Court finds that the Plaintiffs' claims against the individual Defendants brought pursuant to

Section 20(a) of the Securities Exchange Act must be dismissed.

### F. Motion of Plaintiffs to Amend their Complaint

Plaintiffs urge the Court to grant them leave to Amend their Complaint, should the Court find it "insufficient in any way." The Court notes that Plaintiffs proceed on an amended complaint filed seven months after this action was commenced. The Court finds that Plaintiffs have had ample opportunity to plead their case. Moreover, the Reform Act mandates dismissal of "any private action arising under this chapter . . . if the [pleading] requirements . . . are not met." 15 U.S.C. §§ 78u–4(b)(3)(A). The Court therefore finds that the Plaintiffs' request for leave to Amend their Complaint is not well taken and should be denied.

### IV. Conclusion

IT IS THEREFORE ORDERED that the Request of Plaintiffs for Leave to Amend Complaint is hereby denied.

IT IS FURTHER ORDERED that the Motion of Defendants to Dismiss [26–1] is hereby granted. This case is hereby dismissed with prejudice.

A final judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure shall be entered this day.